FILED

JAN 2 7 2015

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUAN FERNANDEZ, | No. C 13-04671 BLF (PR) |
| Petitioner, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY** |
| v. | |
| JEFFREY BEARD, Director, | |
| Respondent. | |

Petitioner, a state prisoner proceeding *pro se*, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1] The Court ordered Respondent to show cause why the petition should not be granted. Respondent has filed an answer addressing the merits of the petition. Petitioner has filed a traverse. Having reviewed the briefs and the underlying record, the Court concludes that Petitioner is not entitled to relief based on the claims presented and denies the petition.

## PROCEDURAL HISTORY

A jury convicted Petitioner of first degree robbery in an inhabited dwelling while

---

[1]This matter was reassigned to this Court on April 17, 2014.

1  acting in concert, kidnaping to commit robbery, first degree burglary, assault with a stun

2  gun or taser, assaults with a deadly weapon or by means of force likely to produce great

3  bodily injury, assault with a firearm, false imprisonment by violence or menace,

4  misdemeanor false imprisonment, abusing and endangering the health of a child, and

5  reckless driving while evading a police officer. (Ans. Ex. 1 at 65-79, 834-840.)

6  Petitioner was sentenced to a determinate sentence of 22 years and eight months, and an

7  indeterminate term of eight years to life in state prison. (*Id.*)

8      Petitioner filed a direct appeal to the California Court of Appeal, which affirmed

9  the conviction on August 18, 2011. (Ans. Ex. 3.) The California Supreme Court denied

10  review on October 26, 2011. (*Id.*, Ex. 4.)

11      On June 25, 2012, Petitioner filed a petition for writ of habeas corpus in the state

12  high court, which denied the petition on March 13, 2013. (*Id.*, Ex. 5.)

13      Petitioner filed the instant federal habeas petition on October 8, 2013.

15  ## BACKGROUND[2]

16  On January 7, 2008, Fernandez was arrested with two other men,
Johan Espinoza and Ruben Salazar, on suspicion of having conducted a
17  robbery in the home of Michael Stanley, who had grown marijuana on his
40-acre parcel in prior years.

19  Espinoza ultimately entered no contest pleas to several counts and
agreed to testify against Fernandez in exchange for consideration in
sentencing. Salazar also accepted a plea bargain.

21  Espinoza testified he had met Ryan Whitman, a one-time friend of
Stanley's, in Fort Bragg in 2007. In December 2007, Whitman told
Espinoza he had been involved with Stanley in the marijuana trade and he
22  believed Stanley owed him "serious money." He therefore asked
Espinoza to put together a group who would go to Stanley's house to
23  "recover" what Whitman thought he was owed.

24  Espinoza recruited Salazar and Fernandez, as well as Anthony
Melendez, the defendant in A128913, and a friend of Melendez's known
25  only as "Youngster," to help with the operation. Melendez was

27      [2]The facts of this case are taken from the California Court of Appeal opinion in
28  *People v. Fernandez*, No. A128145 (Cal. App. 1 Dist. Aug. 18, 2011). (Ans. Ex. 3
("Op").)

Espinoza's uncle by marriage and, along with the other robbers just named, he was a Southern California resident. Whitman and his brother-in-law, Graham Petterson, were also personally involved in the robbery.

The Southern California group met twice with Whitman before carrying out the crime. He advised them to speak only Spanish during the robbery and to use numbers to refer to one another rather than names. Fernandez was "number two," but they forgot to assign numbers to everyone, so the plan did not work. They were told they would not need guns, as Stanley was anti-gun and would not have guns in the house.

The second meeting was at the Pine Beach Inn in Fort Bragg on January 7, 2008, the date of the crime. During the drive up from Southern California, Fernandez showed Espinoza a Taser, and they agreed that was the only weapon they would need. Whitman described the floor plan of the house and told them the money would be hidden under the bed. They initially planned to tie up Stanley and search the house for money and marijuana. Whitman lived locally, and Espinoza and Petterson had local ties, so the three wore masks to avoid being recognized. The men agreed to split whatever they recovered equally.

The robbers drove to Stanley's property in two cars, a green GMC Envoy and a gold Saturn. When they arrived at Stanley's gate, Fernandez, who was a locksmith, handed Espinoza a gun to hold while Fernandez tried and failed to pick the lock on the gate. Fernandez then broke the lock and forced the gate open. Sensing things might "get kind of ugly," Espinoza expressed doubt about going through with the plan. Fernandez called him a "pussy," took back the gun, and led the way to the house.

At about 6:00 p.m., five of the men entered Stanley's home. Also at home were Stanley's wife, Nichole, and their two children, ages six and two. Espinoza and his group were not aware that children would be present. He claimed that he and Whitman searched around the garage and outside the house for money or marijuana while the others went inside.

The men bound Stanley with zip ties, then Melendez – referred to in the transcripts as "gold shirt" – kneeled on him while the others ransacked the house. When their initial search turned up no cash or drugs, the men tried to get Stanley to disclose the location of the money by beating him, using a Taser stun gun on him, pulling down his pants and sticking a fork between his buttocks, poking him behind the ear with the fork, threatening to shoot him in the kneecap with a gun, telling him they had a silencer and "no one's going to hear it." choking him, and hitting him in the head with a metal object. Espinoza, who went into the house briefly, identified Fernandez as the one who pointed the gun at Stanley's kneecap during the assault.

They also tried to get Nichole to tell them where the money was by pulling her hair and threatening her with a Taser while her small children looked on. Fernandez was the one who questioned Nichole about the location of the money. Nichole said she did not know what they were talking about. She took the children into the bedroom and stayed there with them throughout the ordeal, guarded by one of the robbers.

Stanley finally told the intruders the money was hidden outside and

agreed to take them to it.  Three of the men, Fernandez, Melendez, and Espinoza, began walking him toward the money in his stocking feet in 30-degree temperatures, with sleet on the ground, while the other men stayed behind to guard his wife and children.  The three soon decided Stanley was lying about the location of the money and walked him back to his house.

The three men took Stanley in his wife's car, driven by Espinoza, to an area where he directed them, parked the car, and walked Stanley over to a tree stump he pointed out as containing the money.  They found money hidden in the tree stump in a military ammunition can and a black plastic sewer pipe.

The men brought Stanley back to the house, threatening to come back if he went to the police.  They bound Nichole into a chair, barricaded the children in the bathroom, and hog-tied Stanley.  They further looted the house, then took off in Stanley's truck and Nichole's car.

Stanley managed to free himself and his wife, then drove his quad ATV down to his brother-in-law's house on the edge of his property. Lance Mazey, a friend at the brother-in-law's house, had seen two suspicious looking cars parked near Stanley's gate.

Stanley, Mazey, and others from the brother-in-law's house drove in Mazey's truck toward Highway 101.  They found the family's two empty vehicles near Stanley's gate with the doors wide open.  The robbers had transferred the stolen items from the Stanleys' vehicles into their own two cars before fleeing.

Driving down Highway 101, Stanley and his friends looked for the cars Mazey had seen.  They came up behind a green GMC Envoy, which they believed the robbers were driving.  They began to pursue the Envoy and simultaneously called 911 to report the robbery.

Sheriff and CHP officers joined in the pursuit of the Envoy, taking the lead and soon pulling it over.  Inside the Envoy, Fernandez, who was the driver, told the others they could not get out of the car because they still had the money and the gun.  As the officers approached, the Envoy sped off again.

Officers again pursued the vehicle, sometimes at high speeds, this time successfully stopping it with a spike strip and apprehending the three occupants.  Fernandez, Espinoza, and Salazar.  During the chase Espinoza, at Fernandez's instruction, wiped the fingerprints off the gun and Taser and threw them out of the car along with his ski mask.  Salazar and Espinoza began counting the money they had stolen and got up to $117,000 before they started stashing it throughout the car.

Stanley, after the first car stop, went to the sheriff's station and identified Salazar positively and Espinoza tentatively from photographic six-packs.  He later identified Fernandez as one of the men who had taken him from the house to the tree stump and Melendez as "gold shirt."

The police recovered from the Envoy and its occupants a total of $37,734, as well as televisions, jewelry, a video game console, a camera,

and other electronic equipment that had been taken from the Stanleys' home. They also found the lock pick set that Fernandez had used in attempting to get through the Stanleys' gate. A handgun was found on a freeway exit that the Envoy had taken at one point during the pursuit, and Espinoza identified it as the one he had thrown from the Envoy.

The trio [FN6] were charged with the following crimes: (1) conspiracy to commit first-degree robbery in concert (§§ 182, subd. (a) 211, 212.5, 213, subd. (a)(1)(A); (2) robbery in concert of Stanley and Nichole (§§ 211, 212.5, 213, subd. (a)(1)(A); (3) kidnapping to commit robbery of Stanley (§§ 207, subd. (a), 209, subd. (b)(1)); (4) first-degree burglary (§§ 459, 460, subd. (a)); (5) stun-gun assault on Stanley (§ 244.5); (6) assault with a deadly weapon or by means of force likely to cause great bodily injury (§245, subd. (a)(1) (fork assault); (7) firearm assault on Stanley (§ 245, subd. (a)(2)); (8-11) four counts of false imprisonment of Stanley, Nichole, and the two children (§§ 236, 237); (12) and (13) child endangerment of each of the two children (§ 273a, subd. (a)), and (14) reckless driving while evading a peace officer (Veh. Code, § 2800.2, subd. (a).) Arming enhancements were alleged with respect to counts two through six and eight through eleven. (§ 12022, subd. (a)(1).) It was further alleged that Fernandez had sustained four prior convictions for which he had served a prison term. (§ 667.5, subd. (b).)

FN6. Melendez was apprehended later and was separately prosecuted.

The jury deadlocked on count one (conspiracy), as to which a mistrial was declared, but it convicted Fernandez of all other counts, except it found the false imprisonment counts alleged with respect to the minors to be misdemeanors rather than felonies. The arming enhancements were found true as alleged on counts two through six, eight and nine, and the four prior prison terms were also found true.

On March 26, 2010, Fernandez was sentenced to the upper term of nine years for robbery in concert (count two), plus one year for the arming enhancement. He was sentenced to seven years to life for kidnapping Stanley for robbery (count three), plus one year for the arming enhancement. The four-year sentence for burglary (count four), plus the one-year arming enhancement were stayed under section 654. All of the assault counts, false imprisonment of the adults, child endangerment, and reckless evasion (counts five through nine and twelve through fourteen) were sentenced consecutively. For misdemeanor false imprisonment of the children (counts ten and eleven) defendant was sentenced to one year each, imposed concurrently. The true findings on the prior convictions added four years, for a total determinate term of 22 years, eight months [FN7] and an indeterminate term of eight years to life, imposed consecutively.

FN7. Both parties state in their briefs the determinate term was 26 years, eight months, but the abstract of judgment and the reporter's transcript reflect 22 years, eight months. The latter term is consistent with our calculations.

(Op. at 1-6.)

1

## DISCUSSION

2 **I.**   **Standard of Review**

3        This Court may entertain a petition for writ of habeas corpus "in behalf of a person

4 in custody pursuant to the judgment of a state court only on the ground that he is in

5 custody in violation of the Constitution or laws or treaties of the United States." 28

6 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act of 1996

7 ("AEDPA"), a district court may not grant a petition challenging a state conviction or

8 sentence on the basis of a claim that was reviewed on the merits in state court unless the

9 state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or

10 involved an unreasonable application of, clearly established federal law, as determined by

11 the Supreme Court of the United States; or (2) resulted in a decision that was based on an

12 unreasonable determination of the facts in light of the evidence presented in the state

13 court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law

14 and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 384-86 (2000),

15 while the second prong applies to decisions based on factual determinations, *Miller-El v.*

16 *Cockrell*, 537 U.S. 322, 340 (2003).

17        "Under the 'contrary to' clause, a federal habeas court may grant the writ if the

18 state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

19 question of law or if the state court decides a case differently than [the] Court has on a set

20 of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A state court

21 decision is an "unreasonable application of" Supreme Court authority, falling under the

22 second clause of § 2254(d)(1), if the state court correctly identifies the governing legal

23 principle from the Supreme Court's decisions but "unreasonably applies that principle to

24 the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not

25 issue the writ "simply because that court concludes in its independent judgment that the

26 relevant state-court decision applied clearly established federal law erroneously or

27 incorrectly." *Id.* at 411.

28        "Under the 'unreasonable application' clause, a federal habeas court may grant the

1 writ if the state court identifies the correct governing legal principle from [the Supreme

2 Court's] decisions but unreasonably applies that principle to the facts of the prisoner's

3 case." *Williams*, 529 U.S. at 413. "Under § 2254(d)(1)'s 'unreasonable application'

4 clause, . . . a federal habeas court may not issue the writ simply because that court

5 concludes in its independent judgment that the relevant state-court decision applied

6 clearly established federal law erroneously or incorrectly." *Id.* at 411. A federal habeas

7 court making the "unreasonable application" inquiry should ask whether the state court's

8 application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

9 The federal habeas court must presume correct any determination of a factual issue made

10 by a state court unless the petitioner rebuts the presumption of correctness by clear and

11 convincing evidence. 28 U.S.C. § 2254(e)(1).

12    The Supreme Court has vigorously and repeatedly affirmed that under AEDPA,

13 there is a heightened level of deference a federal habeas court must give to state court

14 decisions. *See Hardy v. Cross*, 132 S. Ct. 490, 491 (2011) (per curiam); *Harrington v.*

15 *Richter*, 131 S. Ct. 770, 783-85 (2011); *Felkner v. Jackson*, 131 S. Ct. 1305 (2011) (per

16 curiam). As the Court explained: "[o]n federal habeas review, AEDPA 'imposes a

17 highly deferential standard for evaluating state-court rulings' and 'demands that

18 state-court decisions be given the benefit of the doubt.'" *Id.* at 1307 (citation omitted).

19 With these principles in mind regarding the standard and limited scope of review in which

20 this Court may engage in federal habeas proceedings, the Court addresses Petitioner's

21 claims.

22 **II.   Legal Claims and Analysis**

23    Petitioner claims the following as grounds for federal habeas relief: (A) the

24 CALCRIM No. 400 jury instruction on aiding and abetting violated his right to a jury trial

25 and due process under the Sixth and Fourteenth Amendments; (B) there was insufficient

26 evidence to support the kidnaping to commit robbery conviction; (C) prosecutorial

27 misconduct; and (D) appellate counsel was ineffective for failing to raise all of these

28 claims.

1    **A.    Jury Instructions**

2    Petitioner claims that the trial court misinstructed the jury when it gave CALCRIM

3    No. 400 because it failed to adequately inform the jury that Petitioner could be found

4    guilty of lesser included offenses. (Pet. Attach. at 1.) The following is CALCRIM No.

5    400 as given by the trial court at Petitioner's trial:

6    > A person may be guilty of a crime in two ways. One, he or she may have
directly committed the crime. I will call that person the perpetrator. Two,
7    > he or she may have aided and abetted a perpetrator, who directly
committed the crime. A person is equally guilty of the crime whether he or
8    > she committed it personally or aided and abetted the perpetrator who
committed it.

9

10   (Ans. Ex. 1 at 657; Ex. 2 at 974-975.)

11   Petitioner claims that the last sentence of the instruction – *i.e.*, "[a] person is

12   equally guilty of the crime whether he or she committed it personally or aided and abetted

13   the perpetrator who committed it" – misled the jury into finding guilt "because the way

14   the instruction was worded created automatic guilt as an aider and abettor without any

15   thought given to the specific intent of defendant relative to this specific count." (Pet.

16   Attach. at 3.)

17   To obtain federal collateral relief for errors in the jury charge, a petitioner must

18   show that the ailing instruction by itself so infected the entire trial that the resulting

19   conviction violates due process. *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Cupp v.*

20   *Naughten*, 414 U.S. 141, 147 (1973); *see also Donnelly v. DeChristoforo*, 416 U.S. 637,

21   643 (1974) ("'[I]t must be established not merely that the instruction is undesirable,

22   erroneous or even "universally condemned," but that it violated some [constitutional

23   right].'"). The instruction may not be judged in artificial isolation, but must be

24   considered in the context of the instructions as a whole and the trial record. *See Estelle*,

25   502 U.S. at 72. In other words, the court must evaluate jury instructions in the context of

26   the overall charge to the jury as a component of the entire trial process. *United States v.*

27   *Frady*, 456 U.S. 152, 169 (1982) (citing *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977));

28   *Prantil v. California*, 843 F.2d 314, 317 (9th Cir.1988); *see, e.g., Middleton v. McNeil*,

541 U.S. 433, 434-35 (2004) (per curiam) (no reasonable likelihood that jury misled by single contrary instruction on imperfect self-defense defining "imminent peril" where three other instructions correctly stated the law).

A habeas petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice." *Id.* (citation omitted); *see Calderon v. Coleman*, 525 U.S. 141, 146-47 (1998).

CALCRIM No. 400 was not the only instruction given regarding aiding and abetting. The trial court gave additional instructions, which included CALCRIM Nos. 401 and 402, setting forth the elements for aiding and abetting:

> To prove that defendants are guilty of a crime based on aiding and abetting that crime, the People must prove that:
>
> 1. The perpetrator committed the crime;
>
> 2. The defendant knew that the perpetrator intended to commit the crime;
>
> 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime;
>
> AND
>
> 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.
>
> Someone *aids and abets* a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime. If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider or abettor.

(*Id.*, Ex. 1 at 658; Ex. 2 at 975, emphasis added.)

> The defendant is charged in Count Two with robbery of an inhabited dwelling. The defendant is charged in Counts Three through Fourteen with the *additional crimes* of kidnapping to commit robbery, kidnapping, burglary, assault with a stun gun, assault with a dangerous weapon, assault with a firearm, simple assault, four counts of false imprisonment by

violence or menace, abusing or endangering the health of a child and reckless driving while evading a peace officer and reckless driving. For the purpose of this instruction alone, the term *additional crimes* shall mean the crimes listed above as charged in Counts Three through Fourteen.

You must first decide whether the defendant is guilty of robbery of an inhabited dwelling. If you find the defendant guilty of this crime, you must then decide whether he is guilty of any of the *additional crimes* listed in the preceding paragraph. Under certain circumstances, a person who is guilty of one crime may also be guilty of other crimes that were committed at the same time.

To prove that the defendant is guilty of any of the *additional crimes*, the People must prove that:

1. The defendant is guilty of robbery of an inhabited building;

2. During the commission of robbery of an inhabited dwelling a co-participant in that robbery of an inhabited dwelling committed such an additional crime;

3. Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of such additional crimes were natural and probable consequences of the commission of the robbery of an inhabited dwelling.

A co-participant in a crime is the perpetrator or anyone who aided and abetted the perpetrator. It does not include a victim or innocent bystander.

A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence. If any of the additional crimes were committed for a reason independent of the common plan to commit the robbery of an inhabited dwelling, then the commission of such additional crime was not a natural and probable consequence of robbery and an inhabited dwelling.

To decide whether crime of kidnapping to commit robbery, kidnapping, burglary, assault with a stun gun, assault with a dangerous weapon, assault with a firearm, simple assault, four counts of false imprisonment by violence or menace, abusing or endangering the health of a child and reckless driving while evading a peace officer and/or reckless driving was committed, please refer to the separate instructions that I will give you on each of those crimes.

(*Id.*, Ex. 1 at 658-659; Ex. 2 at 975-977, emphasis added.)

The trial court also gave CALCRIM Nos. 1603 and 1702, defining intent of aiders and abettors as follows:

To be guilty of robbery as an aider and abettor, the defendant must have formed the intent to aid and abet the commission of the robbery before or while a perpetrator carried away the property to a place of temporary

1    safety.

2         A perpetrator has reached a place of temporary safety with the property if
     he or she has successfully escaped from the scene, is no longer being
3    pursued, and has unchallenged possession of the property.

4    (*Id.*, Ex. 1 at 662; Ex. 2 at 982.)

5         To be guilty of burglary as an aider and abettor, the defendant must have
     known of the perpetrator's unlawful purpose and must have formed the
6    intent to aid, facilitate, promote, instigate, or encourage commission of the
     burglary before the perpetrator finally left the structure.

7

8    (*Id.*, Ex. 1 at 664; Ex. 2 at 984.)

9         Here, Petitioner has failed to show that CALCRIM No. 400 by itself so infected

10   the entire trial that the resulting conviction violates due process. *See Estelle*, 502 U.S. at

11   72.  Under state law, this instruction is a "generally correct" statement on aiding and

12   abetting, *i.e.*, that one who aids and abets an offense is guilty as a principal.  Cal. Penal

13   Code § 31[3]; *see People v. Samaniego*, 172 Cal.App.4th 1148, 1165 (2009).  Furthermore,

14   in light of the instructions that were given as a whole, it cannot be said that the jury was

15   likely misled by the language of CALCRIM No. 400 in the manner claimed by Petitioner.

16   The jury received other instructions for aider and abettor liability, as delineated above,

17   which gave definitions and clarification for finding guilt as an aider and abettor.

18   Specifically, CALCRIM No. 401 defined an aider and abettor as "[s]omeone aids and

19   abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she

20   specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate

21   the perpetrator's commission of that crime." *See supra* at 8.  CALCRIM No. 402 gave

22

23       [3]Section 31 states: "All persons concerned in the commission of a crime, whether it
24   be felony or misdemeanor, and whether they directly commit the act constituting the
     offense, or aid and abet in its commission, or, not being present, have advised and
25   encouraged its commission, and all persons counseling, advising, or encouraging children
26   under the age of fourteen years, or persons who are mentally incapacitated, to commit any
     crime, or who, by fraud, contrivance, or force, occasion the drunkenness of another for
27   the purpose of causing him to commit any crime, or who, by threats, menaces, command,
28   or coercion, compel another to commit any crime, are principals in any crime so
     committed." Cal. Penal Code § 31.

more specific instructions regarding Petitioner's liability as to Count Two (robbery of an inhabited dwelling), and the requirements for finding guilt for the "additional crimes" (Counts Three through Fourteen) which were the "natural and probable consequence" of Count Two. *Id.* at 9. CALCRIM Nos. 1603 and 1702 gave further instructions on the specific intent necessary to be guilty as an aider and abettor for robbery and burglary. *Id.* at 10-11. Based on these instructions, the jury could only have found Petitioner guilty as an aider and abettor if they found that (1) the perpetrator was guilty of the specific crime,(2) that Petitioner had the knowledge and the specific intent to, (3) and does in fact, promote the specific crime. It is clear from the facts as determined by the state appellate court that there was more than sufficient evidence to do so: (1) a co-participant testified that Petitioner participated in the crimes, which included the fact that Petitioner was the one with the Taser and a handgun and that he, as the locksmith, had broken the lock of the gate to enter the victim's property;(2) the victim identified Petitioner as one of the men who took him out of the house to retrieve his hidden cash, and (3) Petitioner was the driver of the getaway vehicle. *See supra* at 2-4. Lastly, there is no indication in the evidence that Petitioner could have been found guilty of a lesser offense, nor does Petitioner assert what that lesser offense could have been. Accordingly, even if there was error, Petitioner has failed to show "actual prejudice" and is not entitled to habeas relief. *See Brecht*, 507 U.S. at 637.

Petitioner argues that his case is no different from *People v. Nero*, 181 Cal.App.4th 504, 104 Cal.Rptr.3d 616 (2010), where a similar challenge to CALCRIM No. 400 was raised. (Pet. Attach. at 2.) In *Nero*, the jury sent a question to the court during deliberations asking whether the accomplice in that case could be guilty of a crime less than the direct perpetrator, and the trial court responded by rereading the instruction stating that aiders and abettors are "equally guilty." *Id.* at 509-510. The *Nero* court found that the "equally guilty" language was confusing and that the trial court's giving of that language in response to the jury's direct question was error. *Id.* at 518. Petitioner asserts that the jury in his case also asked questions which evidenced "their difficulty with the

Case 5:13-cv-04671-BLF  Document 12  Filed 01/27/15  Page 13 of 21

inchoate theories of culpability." (Pet. Attach. at 1.)  Respondent asserts that the *Nero* is

distinguishable.  The following is what transpired with respect to the jury questions in

Petitioner's case.

On February 4, 2010, the jury asked: "If the defendant is found guilty of

conspiracy or committing robbery in concert with others, does the conspiracy make him

guilty of all the other charges even though we might not believe he personally committed

that particular crime (i.e., counts 3-14)?  How far do we take the conspiracy charge in

applying it to the remaining charges?" (Ans. Ex. 1 at 784.)  After consulting with

counsel, the court responded to the jury's question by providing an amended version of

CALCRIM No. 417, which stated:

> A member of a conspiracy is criminally responsible for the crimes that he
> or she conspires to commit, no matter which member of the conspiracy
> commits the crime.
>
> A member of a conspiracy is also criminally responsible for any act of any
> member of the conspiracy if that act is done to further the conspiracy and
> that act is a natural and probable consequence of the common plan or
> design of the conspiracy.  This rule applies even if the act was not intended
> as part of the original plan.
>
> A *natural and probable consequence* is one that a reasonable person would
> know is likely to happen if nothing unusual intervenes.  In deciding
> whether a consequence is natural and probable, consider all of the
> circumstances established by the evidence.
>
> A member of a conspiracy is not criminally responsible for the act of
> another if that act does not further the common plan or is not a natural and
> probable consequence of the common plan.
>
> To prove that the defendant is guilty of any of the crimes charged in Count
> Three through Fourteen, the People must prove that:
>
> 1. The defendant conspired to commit the offense of robbery of an
> inhabited dwelling;
>
> 2. A member of the conspiracy committed one or more of the crimes of
> kidnapping to commit robbery, kidnapping, burglary, assault with a stun
> gun, assault with a dangerous weapon, assault with a firearm, simple
> assault, four counts of false imprisonment by violence or menace, abusing,
> or endangering the health of a child and reckless driving while evading a
> peace officer and reckless driving, AND
>
> 3. The crimes of kidnapping to commit robbery, kidnapping, burglary,
> assault with a stun gun, assault with a dangerous weapon, assault with a
> firearm, simple assault, four counts of false imprisonment by violence or

Order Denying Petition for Writ of Habeas Corpus; Denying COA
P:\PRO-SE\BLF\HC.13\04671Fernandez_denyHC.wpd          13

menace, abusing or endangering the health of a child and reckless driving while evading a peace officer and reckless driving were the natural and probable consequences of the common plan or design of the crime that the defendant conspired to commit.

(Ans. Ex. 1 at 677, 786.)

The next day on February 5, 2010, the jury asked two more questions: (1) "If the defendant is found guilty of count two [robbery] "while acting in concert," does that carry over to charges three through fourteen and additional crimes," and (2) can he be found guilty of those charges merely because he was part of the group that committed the crimes as an aider and abettor?" (*Id.*, Ex. 1 at 787.) After consulting with counsel, the trial court responded to the first question as follows: "The term 'while acting in concert' refers to one of the elements of Count two. The phrase applies **only** to Count Two and does not directly relate to your findings in the crimes charged in Counts Three through Fourteen." The court responded to the second question as follows: "In order to find the defendant guilty as an aider and abettor of any of the crimes charged in Counts Three through Fourteen, you must follow Instructions 400, 401, and 402." (*Id.*, Ex. 1 at 747, 788.)

Unlike in *Nero*, where the trial court twice referred to the instruction using the "equally guilty" language, 181 Cal.App.4th at 518-520, the trial court in Petitioner's case never expressly did so. Rather, he provided an amended instruction to answer their first question with respect to the scope of liability as a conspirator, and then referred them to the appropriate instructions in answer to their last question. There was no instruction that the jury must find Petitioner guilty strictly based on CALCRIM No. 400 alone. Furthermore, from the fact that the jury was hung as to the conspiracy charge (count one) but was still able to find Petitioner guilty as an aider and abettor as to the rest indicates that their difficulty was only with the conspiracy instructions. *See supra* at 5.

Based on the foregoing, the state court's rejection of this claim was not contrary to, or involved an unreasonable application of, Supreme Court precedent. 28 U.S.C. § 2254(d)(1). Petitioner is not entitled to habeas relief on this claim.

///

### B.   Insufficient Evidence

Petitioner's second claim is that his conviction for kidnapping to commit robbery violates due process because there was insufficient evidence of guilt. Petitioner asserts that there was no evidence that he had the specific intent to kidnap anyone and that the evidence at trial was "in serious conflict and inconclusive" as to his involvement in the kidnapping. (Pet. Attach. at 5.) In support, Petitioner claims that: (1) the victims could not identify him in a photo lineup that night or the next day; (2) two victims placed him in different locations when the kidnapping occurred; and (3) the testifying co-defendant, Espinoza, was of questionable credibility and perjured himself when he denied his personal involvement in the kidnapping because the victim clearly remembered Espinoza's involvement in that event. (*Id.*)

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, *see Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, *see id.* at 324.

The Supreme Court has emphasized that "*Jackson* claims face a high bar in federal habeas proceedings...." *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (per curiam) (per curiam) (finding that the 3rd Circuit "unduly impinged on the jury's role as factfinder" and failed to apply the deferential standard of *Jackson* when it engaged in "fine-grained factual parsing" to find that the evidence was insufficient to support petitioner's conviction). A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992), *cert. denied*, 510 U.S. 843 (1993); *see, e.g., Coleman*, 132 S. Ct. at 2065 ("the only question under *Jackson* is whether [the jury's finding of guilt] was so insupportable as to fall below the threshold

1    of bare rationality"). The federal court "determines only whether, 'after viewing the

2    evidence in the light most favorable to the prosecution, any rational trier of fact could

3    have found the essential elements of the crime beyond a reasonable doubt.'" *Payne*, 982

4    F.2d at 338 (quoting *Jackson*, 443 U.S. at 319). Only if no rational trier of fact could

5    have found proof of guilt beyond a reasonable doubt, has there been a due process

6    violation. *Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d at 338; *Miller v. Stagner*, 757 F.2d

7    988, 992-93 (9th Cir.), *amended*, 768 F.2d 1090 (9th Cir. 1985), *cert. denied*, 475 U.S.

8    1048, *and cert. denied*, 475 U.S. 1049 (1986); *Bashor v. Risley*, 730 F.2d 1228, 1239 (9th

9    Cir.), *cert. denied*, 469 U.S. 838 (1984).

10         In sum, sufficiency claims on federal habeas review are subject to a "twice-

11   deferential standard." *Parker v. Matthews*, 132 S. Ct. 2148, 2152 (2012) (per curiam).

12   First, relief must be denied if, viewing the evidence in the light most favorable to the

13   prosecution, there was evidence on which "*any* rational trier of fact could have found the

14   essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Jackson*, 443

15   U.S. at 324). Second, a state court decision denying a sufficiency challenge may not be

16   overturned on federal habeas unless the decision was "objectively unreasonable." *Id.*

17   (quoting *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011)).

18         Petitioner's claim is without merit. Viewing the evidence in the light most

19   favorable to the prosecution, there was sufficient evidence here on which any rational

20   trier of fact could have found Petitioner guilty of kidnapping. The conflicting evidence at

21   trial on which Petitioner relies were all presented to the jury to consider in their

22   deliberations. Petitioner points to the victim Nichole's belief that Petitioner was still at

23   the house when the kidnapping occurred. However, the facts as determined by the state

24   appellate court indicate that she was inside a room with the children at the time her

25   husband was taken away from the house. *See supra* at 3. Although the victim Stanley

26   could not identify Petitioner on the night of the incident or the next day, he was able to do

27   so at a later time, and the jury was free to weigh the reliability of that identification. *See*

28   *supra* at 4. Lastly, under *Jackson*'s standard of review, a jury's credibility determinations

1    are entitled to near-total deference. *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004).

2    Except in the most exceptional of circumstances, *Jackson* does not permit a federal

3    habeas court to revisit credibility determinations. *See id.* (credibility contest between

4    victim alleging sexual molestation and defendant vehemently denying allegations of

5    wrongdoing not a basis for revisiting jury's obvious credibility determination); *see also*

6    *People of the Territory of Guam v. McGravey*, 14 F.3d 1344, 1346-47 (9th Cir. 1994)

7    (upholding conviction for sexual molestation based entirely on uncorroborated testimony

8    of victim).  Accordingly, the credibility, or lack thereof, of the co-defendant's testimony

9    was a matter for the jury to decide and may not be revisited by this Court in assessing

10   Petitioner's insufficient evidence claim. *Id.*

11          Lastly, the state appellate court made specific findings with respect to Petitioner's

12   role in the crimes:

> Finally, we take issue with trial counsel's characterization of Fernandez's role as that of a passive gatherer of property during the home invasion. It was Fernandez who supplied both the handgun and the Taser. When Espinoza began to get cold feet, Fernandez pushed forward with the crime, taking a leadership role. Fernandez interrogated Nichole, and he participated in the assaults by pointing the gun at Stanley's knee. Inferably, he was also the one who hit Stanley in the head with the gun, almost knocking him unconscious. Fernandez was one of the kidnappers who escorted Stanley to the tree stump. Finally, Fernandez drove the getaway car, fled from the police, told the others not to surrender, and ordered Espinoza to dispose of evidence. For his very active role in this heinous series of crimes, Fernandez was justly punished.

20   (Op. at 17.)  Based on the evidence presented, the state appellate court's determination in

21   this regard was not "objectively unreasonable." *See Parker*, 132 S. Ct. 2148, 2152.

22          Accordingly, it cannot be said that the state court's rejection of this claim was

23   contrary to, or an unreasonable application of, clearly established Supreme Court

24   precedent, nor was it based on an unreasonable determination of the facts in light of the

25   evidence presented.  28 U.S.C. § 2254(d).  Petitioner is not entitled to federal habeas

26   relief on this claim.

27   **C.    Prosecutorial Misconduct**

28          Petitioner claims that there was prosecutorial misconduct during closing arguments

1   which violated his right to due process and a fair trial. (Pet. Attach. at 6.) Specifically,

2   Petitioner argues that the prosecution inappropriately urged the jury to consider

3   Petitioner's four prior convictions as proof of his intent to commit robbery and that

4   Petitioner was the one who would know how to plan a robbery. (*Id.*)

5        Prosecutorial misconduct is cognizable in federal habeas corpus. The appropriate

6   standard of review is the narrow one of due process and not the broad exercise of

7   supervisory power. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). A defendant's due

8   process rights are violated when a prosecutor's misconduct renders a trial "fundamentally

9   unfair." *Id.*; *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process

10  analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the

11  culpability of the prosecutor"). Under *Darden*, the first issue is whether the prosecutor's

12  remarks were improper; if so, the next question is whether such conduct infected the trial

13  with unfairness. *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005).

14       The appropriate standard on federal habeas corpus review of a state conviction for

15  determining whether a constitutional error of the trial type – like prosecutorial misconduct

16  – is harmless is that of *Kotteakos v. United States*, 328 U.S. 750, 776 (1946): whether the

17  error had a substantial and injurious effect or influence in determining the jury's verdict,

18  rather than whether it was harmless beyond a reasonable doubt. *Brecht v. Abrahamson*,

19  507 U.S. 619, 637 (1993). Under this standard, habeas petitioners are not entitled to

20  habeas relief based on trial error unless they can establish that it resulted in "'actual'"

21  prejudice. *See id.* (citing *United States v. Lane*, 474 U.S. 438, 449 (1986)); *Johnson v.*

22  *Sublett*, 63 F.3d at 930 (finding prosecutorial vouching "could not have had substantial

23  impact on the verdict necessary to establish reversible constitutional error" under *Brecht*).

24  Further, because the standard is grounded in the federal harmless-error rule (28 U.S.C. §

25  2111), federal courts may turn to an existing body of case law in applying it. *See Brecht*,

26  507 U.S. at 638. The *Brecht* standard applies in federal habeas corpus cases under §

27  2254. *See Bains v. Cambra*, 204 F.3d 964, 977 (9th Cir. 2000).

28       Even if we assume that the prosecutor's comments in closing argument rise to the

1    level of misconduct, this claim has no merit because Petitioner cannot show that the

2    misconduct had a "substantial and injurious effect" on the jury's verdict.  Petitioner

3    admits in his petition that during voir dire, the prosecutor and the judge explained

4    "several times" that the "prior convictions anticipated to be introduced as evidence were

5    only to be considered for the limited purpose of proving the prior prison sentencing

6    enhancements." (Pet. Attach. at 6.)  The jury instructions also explicitly set forth "the

7    limited purpose [of] the prior conviction evidence" which could not be used "as proof that

8    defendant committed any of the crimes which he was currently charged with." (*Id.* at 6-

9    7.)   Such limiting instruction obviated any concern that the prosecutor's inappropriate

10   statements during closing argument would unduly effect the jury's verdict. *See Weeks v.*

11   *Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987)

12   (jury is presumed to follow its instructions); *Doe v. Busby*, 661 F.3d 1001, 1017 (9th Cir.

13   2011) (habeas court must presume that jury follows instructions it was given.)

14          Accordingly, the state court's rejection of this claim was not contrary to, or an

15   unreasonable application of, clearly established Supreme Court precedent, nor was it

16   based on an unreasonable determination of the facts in light of the evidence presented.  28

17   U.S.C. § 2254(d).  Petitioner is not entitled to federal habeas relief on this claim.

18          **D.**     **Ineffective Assistance of Appellate Counsel**

19          Petitioner's last claim is that appellate counsel rendered ineffective assistance for

20   failing to raise any of the issues in the instant petition on appeal.

21          Claims of ineffective assistance of appellate counsel are reviewed according to the

22   standard set out in *Strickland v. Washington*, 466 U.S. 668 (1984). *Smith v. Robbins*, 528

23   U.S. 259, 285 (2000); *Moormann v. Ryan*, 628 F.3d 1101, 1106 (9th Cir. 2010); *Miller v.*

24   *Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989).  First, the petitioner must show that

25   counsel's performance was objectively unreasonable, which in the appellate context

26   requires the petitioner to demonstrate that counsel acted unreasonably in failing to

27   discover and brief a merit-worthy issue. *Smith*, 528 U.S. at 285; *Moormann*, 628 F.3d at

28   1106. Petitioner must overcome the "strong presumption that [appellate] counsel's

1   conduct [fell] within the wide range of reasonable professional assistance," *Strickland*,

2   466 U.S. at 689.  Second, the petitioner must show prejudice, which in this context means

3   that the petitioner must demonstrate a reasonable probability that, but for appellate

4   counsel's failure to raise the issue, the petitioner would have prevailed in his appeal.

5   *Smith*, 528 U.S. at 285-86; *Moormann*, 628 F.3d at 1106.

6          With regard to the first prong, the Supreme Court has held that appellate counsel

7   need not, and should not, raise every nonfrivolous claim.  *Smith*, 528 U.S. at 288.

8   Instead, appellate counsel should select from among the various appealable issues "in

9   order to maximize the likelihood of success on appeal."  *Id.*  In discussing this standard,

10  the Supreme Court noted that "it is still possible to bring a *Strickland* claim based on

11  counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel

12  was incompetent.  *See, e.g.*, *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)

13  ("Generally, only when ignored issues are clearly stronger than those presented, will the

14  presumption of effective assistance of counsel be overcome")."  *Id.*  With regard to the

15  second prong, "[a] reasonable probability is a probability sufficient to undermine

16  confidence in the outcome." *Strickland*, 466 U.S. at 694.  It is not enough to show that

17  counsel's errors had some conceivable effect on the outcome of the proceeding because

18  "virtually every act or omission of counsel would meet that test... and not every error that

19  conceivably could have influenced the outcome undermines the reliability of the result of

20  the proceeding."  *Id.* at 693 (internal citation omitted).

21         Petitioner has failed to demonstrate that he would have prevailed upon appeal if

22  appellate counsel had raised any of the claims discussed above, particularly as the Court

23  has determined that each has no merit: (1) CALCRIM No. 400 jury instruction on aiding

24  and abetting, in light of the instructions that were given as a whole, did not by itself so

25  infect the entire trial that the resulting conviction violated due process, *see supra* at 11-

26  12; (2) viewing the evidence in the light most favorable to the prosecution, there was

27  sufficient evidence on which any rational trier of fact could have found Petitioner guilty

28  of kidnapping, *id.* at 16-17; and (3) the alleged prosecutorial misconduct did not have a

1   substantial and injurious effect on the jury's verdict, *id.* at 18-19.  Because Petitioner has

2   failed to show that appellate counsel's performance with respect to such meritless claims

3   was deficient and that he was prejudiced by it, the Court finds that the state court's

4   rejection of this claim was not contrary to, or an unreasonable application of, clearly

5   established Supreme Court precedent, nor was it based on an unreasonable determination

6   of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).  Accordingly,

7   Petitioner is not entitled to habeas relief on this claim.

8

9                                                **CONCLUSION**

10           For the reasons set forth above, the petition for writ of habeas corpus is **DENIED**.

11          The federal rules governing habeas cases brought by state prisoners require a

12   district court that denies a habeas petition to grant or deny a certificate of appealability

13   ("COA") in its ruling.  *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. §

14   2254.  Petitioner has not shown "that jurists of reason would find it debatable whether the

15   petition states a valid claim of the denial of a constitutional right."  *Slack v. McDaniel*,

16   529 U.S. 473, 484 (2000).  Accordingly, a COA is **DENIED**.

17           The Clerk shall close the file.

18           **IT IS SO ORDERED.**

19

20   DATED: _January 27, 2015_                    _____

21                                                BETH LABSON FREEMAN
                                                  United States District Judge

22

23

24

25

26

27

28